# IN THE UNITED STATES DISTRICT COURT RECEIVED
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

2019 JUN 26  P 2: 01

JANETHEA WHEELER,              )
                               )          DEBRA P. HACKETT, CLK
                               )          U.S. DISTRICT COURT
        Plaintiff,             )          MIDDLE DISTRICT ALA
                               )
                               )     Civil Action No.
vs.                            )     3:19-CV-450-SRW
                               )     **JURY DEMAND**
STRAEHLE + HESS USA INC., and  )
A-1 EMPLOYMENT, INC.,          )
                               )

        Defendants.

## COMPLAINT

### I. JURISDICTION

1. This is a suit for relief from discrimination and retaliation instituted pursuant to the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §12101 *et seq.* Jurisdiction of this Court exists pursuant to 28 U.S.C. §§1331 and 1343(4).

2. Plaintiff Janethea Wheeler timely filed charges of discrimination against defendants Straehle + Hess USA Inc. and A-1 Employment, Inc. with the Equal Employment Opportunity Commission ("EEOC") within 180 days after the last acts of discriminatory treatment. Plaintiff has further filed this suit within 90 days after receipt of her right-to-sue letters issued from the EEOC.

## II. **PARTIES**

3. Plaintiff Janethea Wheeler ("Plaintiff") is a citizen of the United States over the age of nineteen and a resident of Lee County, Alabama.

4. Defendant Straehle + Hess USA Inc. ("S+H") is a corporation with a principal place of business in Auburn, Alabama. It is and was at all times relevant to this complaint an employer as contemplated under the ADA.

5. Defendant A-1 Employment, Inc. ("A-1") is a corporation with a principal place of business in Opelika, Alabama. It is and was at all times relevant to this complaint an employer as contemplated under the ADA. S+H and A-1 are collectively referred to herein as "Defendants."

## III. **STATEMENT OF FACTS**

6. Plaintiff has Systemic Lupus Erythematosus and did so during the events of this case.

7. Lupus is a systemic autoimmune disease, causing Plaintiff's immune system to attack cells and tissues in her body.

8. Plaintiff's lupus results in episodic flare ups and did so during the events of this case.

9. During these flare ups, Plaintiff is and was debilitated with fatigue and painful inflammation in her body.

2

10. A-1 is a staffing company.

11. S+H makes textiles for the automotive industry.

12. During the events of this case, A-1 was engaged by S+H to procure workers for S+H at its plant in Auburn, Alabama.

13. In or about December of 2017, Plaintiff was hired by A-1 to work for S+H at its Auburn plant.

14. Plaintiff was told that she would work for S+H on a "temp to perm" basis, that is that she would be eligible to become hired directly by S+H if she performed satisfactorily in a 90-day period.

15. A-1 paid Plaintiff and S+H paid A-1 for Plaintiff's services based on the hours she worked.

16. A-1 did not direct or supervise Plaintiff's work.

17. A-1 did not provide Plaintiff any materials or equipment she utilized in the performance of her duties for S+H.

18. S+H exclusively directed the work that Plaintiff performed for S+H.

19. S+H exclusively directed the hours that Plaintiff worked.

20. S+H exclusively supervised Plaintiff's work.

21. S+H exclusively provided Plaintiff the materials and equipment for the performance of her duties.

3

22. S+H worked Plaintiff for an indefinite (as opposed to finite) period of time.

23. Plaintiff was paid by the hour, rather than based on the cost of performing a particular job.

24. The work performed by Plaintiff for S+H was an integral part of the regular operations of S+H.

25. Given the number of hours S+H required Plaintiff to work, she was economically dependant upon S+H during the period she worked for S+H.

26. Eddie Tolbert, an S+H employee, was Plaintiff's supervisor.

27. On or about April 17, 2018, Plaintiff was about a week away from being eligible to be hired directly by S+H.

28. Tolbert told Plaintiff that she would be working that day on the "green" machine by herself.

29. The green machine was fairly new and Plaintiff had not worked on it before.

30. The green machine required more physical labor than the other machines because it did not have all the parts for it and operating it required bending over it and performing repetitive motions for long periods of time.

31. Due to Plaintiff's lupus, she was not able to do that kind of work.

32. Plaintiff told Tolbert that she could not work the green machine.

4

33. Tolbert went and got Josh Morton, S+H's Operations Manager at the time, and brought him over to where Plaintiff was.

34. Thomas Klein, S+H's CFO at the time, was also then present.

35. Plaintiff stated that she could not work bending over the green machine doing the repetitive motions.

36. Morton asked what if he did not have anything else for Plaintiff to do.

37. Plaintiff informed them of her lupus.

38. Morton asked Plaintiff if A-1 knew about her having lupus and needing restrictions.

39. Plaintiff told him she had told A-1 that she received an SSI check but that she did not tell them she needed restrictions because she did not know that she would have any.

40. Plaintiff added that she could get a note from her doctor.

41. Morton asked Plaintiff again what if he did not have anything else for her to do.

42. Plaintiff asked Morton if he could put her on another machine.

43. Morton told Plaintiff to go home and come back the next afternoon and they would figure something out.

5

44. On or about April 18, 2018, Plaintiff went back to work that afternoon as directed.

45. Plaintiff met then with Morton, Klein, and Brent Scott, S+H's Production Manager at the time.

46. Plaintiff stated that she could work on the green machine if they got it working properly, but that she could not work on it as it was because bending over it doing repetitive motions for a long time would cause her lupus to flare up and her body to stiffen.

47. Plaintiff further asked if they could let her work on another machine until they got the green machine working properly.

48. Morton said they did not want to do something that would hurt Plaintiff or make her sick and that "that would be on" them.

49. Plaintiff told Morton that there had not been an issue and that she was coming to them now about it so there would not be an issue.

50. Morton said to let him talk it over with Klein and Scott since Scott had not been there the day before.

51. On or about April 19, 2018, Plaintiff went back to work and Scott met with her.

6

52. Scott told Plaintiff that, since she was still working through A-1, she needed to get a restriction paper from her doctor and take it to A-1 and that they would put her back at work on a different machine when A-1 okayed her.

53. On or about Friday, April 20, 2018, Plaintiff got a letter from her doctor stating that she has lupus, that she is unable to stay in one position doing repetitive motions for extended periods of time, and that it would be better for her muscles and joints if she could change positions and vary her movements frequently.

54. The work Plaintiff had been doing on the other machines did not go beyond what her doctor recommended.

55. Plaintiff took the letter to A-1.

56. The person Plaintiff spoke to there said that Plaintiff could not have any restrictions.

57. Plaintiff told the A-1 representative that Scott had said that she could go back to working on a machine that she had been able to work on with no problems if A-1 approved her return.

58. The A-1 representative told Plaintiff that she would email the doctor's letter to Scott and get back with Plaintiff as soon as they heard from him.

59. Plaintiff sent Scott a text and told him that she had dropped the letter off at A-1.

7

60. Plaintiff texted Scott back a little while later and asked when she would be able to return to work but got no response.

61. On or about that next Monday, April 23, 2018, Plaintiff sent Scott another text asking about returning to work but again got no reply.

62. On or about April 26, 2018, Plaintiff had not heard anything and called A-1.

63. Plaintiff spoke to an A-1 representative, who told her that Scott had been out of work, that they were still waiting to hear from him, and that they would call Plaintiff when they did.

64. Plaintiff asked about getting a work assignment somewhere else and was told that they needed to wait to hear back from S+H.

65. On or about May 2, 2018, Plaintiff still had not heard back from A-1 and called them again.

66. Plaintiff was again told that they were waiting to hear back from Scott.

67. Plaintiff suggested that she call Scott and was told no, that Plaintiff was supposed to go through A-1.

68. Plaintiff again asked about another work assignment and was told again that they needed to wait to hear from S+H.

8

69. On or about May 10, 2018, Plaintiff still had not heard back from A-1 and called them again.

70. Plaintiff was again told that they were still waiting to hear back from Scott and they could not give Plaintiff another work assignment because they needed to wait to hear from S+H.

71. Plaintiff continued to check with A-1 until mid-June of 2018 and was told the same thing.

72. After Plaintiff asked A-1 about being assigned to work elsewhere as set forth above, A-1 had open positions for which Plaintiff was qualified, but they did not assign her to any.

73. In response to the EEOC charge Plaintiff filed against A-1, it stated to the EEOC that S+H contacted A-1 on April 19, 2018 and terminated Plaintiff.

74. In response to the EEOC charge Plaintiff filed against S+H, it stated to the EEOC that Scott told Plaintiff and A-1 on April 19 that Plaintiff needed clearance from A-1 to return to work and that he was sending her back to A-1 for "further directions."

75. S+H further stated to the EEOC that, had it received a letter from Plaintiff's doctor, it would have referred her for a fitness-for-duty evaluation and engaged in "an

9

interactive process," but that S+H never received the letter and never even heard from A-1 or Plaintiff after Plaintiff met with Scott on the 19th.

76. S+H further stated to the EEOC that, having never received the letter nor heard again from Plaintiff or A-1, it "ended [Plaintiff's] assignment due to her unacceptable attendance record and insubordination, and the fact that her 90 day/520 hour assignment had expired."

77. S+H's assertions that Plaintiff failed to get back in touch with S+H, had unacceptable attendance, and engaged in insubordination, are false and pretextual.

## IV. CAUSES OF ACTION

### COUNT I

### ADA- TERMINATION OF EMPLOYMENT (BOTH DEFENDANTS)

78. Paragraphs 1-77 are incorporated herein.

79. Plaintiff's lupus constitutes physical impairments under the ADA and did so during the events of this case.

80. Due to these impairments, Plaintiff was and is substantially limited with respect to the major life activity of the major bodily function of her immune system and the adverse results to her body caused by these impairments to her immune system.

81. Plaintiff is disabled under the ADA and was during the events of this case.

10

82.  Plaintiff was and is a qualified individual able to perform the essential functions of her position with S+H, with accommodation.

83.  Based on the facts set forth above, Defendants were joint employers of Plaintiff under applicable ADA law with respect to her work with S+H.

84.  Defendants– jointly, severally, or individually– violated Plaintiff's rights under the ADA by terminating her employment because of (a) her disability, (b) as a result of their failure to reasonably accommodate her disability, and/or (c) in retaliation for her having requested a reasonable accommodation for her disability in the form of temporary alternative work assignment.

85.  As a result of the above described discriminatory act, Plaintiff has been made to suffer lost wages and benefits, emotional distress, and mental anguish.

**WHEREFORE, these premises considered**, Plaintiff respectfully requests the following:

(i)  That the Court issue an Order declaring that Defendants' actions described herein violated the ADA;

(ii)  That the Court enter an Order requiring Defendants to make Plaintiff whole by reinstating her and placing her in the position she would have occupied in the absence of discrimination (or, alternatively, providing front-pay), providing back-pay

11

with interest, and ordering Defendants to pay compensatory and punitive damages as a jury may assess;

(iii)     That the Court grant Plaintiff a permanent injunction enjoining Defendants, and their agents, employees, successors, and those acting in concert with Defendants, from further violation of Plaintiff's rights under the ADA:

(iv) That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate her for any adverse tax consequences as a result of a judgment in her favor; and

(v)     That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

## COUNT II

## ADA

### ADA- FAILURE TO HIRE (A-1)

86. Paragraphs 1-77 and 79-81 above are incorporated herein.

87. Plaintiff was and is a qualified individual able to perform the essential functions of available positions, with or without accommodation.

88. A-1 violated Plaintiff's rights under the ADA by passing her over for work assignments after her work with S+H because of (a) her disability, (b) as a result of

12

A-1's failure to reasonably accommodate her disability, and/or (c) in retaliation for her having requested a reasonable accommodation for my disability.

89.   As a result of the above described discriminatory acts, Plaintiff has been made to suffer lost wages and benefits, emotional distress, and mental anguish.

**WHEREFORE, these premises considered,** Plaintiff respectfully requests the following:

(i)  That the Court issue an Order declaring that A-1's actions described herein violated the ADA;

(ii)  That the Court enter an Order requiring A-1 to make Plaintiff whole by placing her in the position she would have occupied in the absence of discrimination (or, alternatively, providing front-pay), providing back-pay with interest, and ordering A-1 to pay compensatory and punitive damages as a jury may assess;

(iii)  That the Court grant Plaintiff a permanent injunction enjoining A-1's, and its agents, employees, successors, and those acting in concert with A-1 from further violation of Plaintiff's rights under the ADA;

(iv)  That the Court award Plaintiff prejudgment and post-judgment interest at the highest rates allowed by law and an amount to compensate her for any adverse tax consequences as a result of a judgment in her favor; and

(v)   That the Court award such other legal and equitable relief as justice requires, including, but not limited to, an award of costs, attorney's fees, expert witness fees, and expenses.

Respectfully submitted,

Adam M. Porter
Attorney for Plaintiff
Adam M. Porter, LLC
Alabama Bar ID: ASB-2472-P75A
2301 Morris Avenue, Suite 102
Birmingham, Alabama 35203
Phone: (205) 322-8999
Facsimile: (205) 322-8915
Email: adamporter@earthlink.net

Plaintiff requests trial by struck jury.

Attorney for Plaintiff

**Defendants' Addresses:**
Straehle + Hess USA Inc.
c/o CT Corporation System, Registered Agent
2 North Jackson St., Suite 605
Montgomery, AL 36104

A-1 Employment, Inc.
c/o Kimberly J. Dial, Registered Agent
400 South Eighth St., Suite 101
Opelika, AL 36801

14